Case 66—CONSTRUCTION OF DEVISE—Dec. 9.

# Spalding, Etc. v. St. Joseph's Industrial School, Etc.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

1. PRACTICE—ALTERNATIVE RELIEF—MOTION TO ELECT.—An action to annul a devise for charitable purposes on the ground that such devise is void for uncertainty does not contain inconsistent causes of action because the petition prays in the alternative for an enforcement of the trust if it should be declared a valid one.

2. LIMITATION—QUESTION NOT RAISED BY DEMURRER.—The statute of limitations can not be taken advantage of on general demurrer to the petition unless the defenses go to the entire cause of action stated as to all the plaintiffs.

3. LAPSE OF TIME—LACHES.—"When lapse of time does not operate

as a statutory bar, it can be applied only by raising a presumption of assent to the existing status under such circumstances as to prevent substantial justice being done between the parties, in which event the courts will declare the relief sought inequitable; or in cases where, on account of the gross neglect and laches in bringing the suit, the disturbance resulting from the establishment of the claim would make it a matter of public policy that the offending party shall abide the consequences of his own failure."

4. DEVISES TO CHARITABLE OBJECTS—*Cy Pres*—CERTAINTY REQUIRED. —A devise in this language: "I bequeath to my brother, the most Rev. M. J. Spalding, Archbishop of Baltimore, all my real, personal and mixed estate, and all I may die seized of, for charitable objects, to be expended for said objects under this diocese of Louisville, according to his discretion," is void for uncertainty.

5. EQUITY—IMPOSING EQUITABLE TERMS.—In reversing the case with directions to adjudge the will invalid the court imposed as an equitable condition that all expenses in caring for the property in an effort to execute the trust should be paid and that reasonable compensation should be made for the management of the property.

J. W. S. CLEMENTS AND S. J. BOLDRICK FOR APPELLANTS.

1. On devises for charitable purposes: Gallego v. The Attorney-General, 3 Leigh., 450; Act 9th. George II, ch. 36; Moore v. Moore, 4 Dana, 365; Gas & Bonta v. Wilhite, 2 Dana, 177; Statute 43d of Elizabeth; 2 Perry on Trusts, sec. 748 and note 1; Curling v. Curling, 8 Dana, 38; Attorney-General v. Wallace, 7 B. Mon., 611; Maurice v. Bishop of Durham, 9 Ves., 399; Cromie's hrs. v. Louisville Orphans' Home Society, 3 Bush, 374; Leeds v. Shaw, 82 Ky., 79; Beckman v. Bonson, 23 N. Y., 298; Kinney v. Kinney, 86 Ky., 610; Penick v. Thom, 90 Ky., 665; Ford v. Ford, 91 Ky., 572; Givens' Admr. v. Shouse, 5 Ky. Law Rep., 419; Tichnor v. Brewer, 17 Ky. Law Rep., 936; Uppington v. Corrigan, 76 N. Y. Sup. Ct., 320; 151 N. Y., 143; Bispham on Equity, 165; Pom. Eq. Jur., vol. 2, sec. 1019; Tilden's Will, 130 N. Y., 29; Read v. Williams, 125 N. Y., ——; Pritchett v. Thompson, 95 N. Y., 76; Johnson v. Johnson, 92 Tex., 559; Grimes v. Harmon, 35 Ind., 198; Dashiels v. Attorney-General, 5 Har. & J., 392; Wheeler v. Smith, 9 How., 55; Churchman v. Churchman, 80 Va., ——; 3 W. Va., 174; Bridges v. Pleasant, Iredell Eq., —— N. C., ——; 63 N. C., 537; 53 Conn., 242; 30 Conn., 113; 31 Conn., 407; 24 Conn., 350; 22 Conn., 54, 31; Webster v. Morris, 56 Wis., 366; LePage v. McNamara, 5

Spalding, &c., v. St. Joseph's Industrial School, &c.

Clark (Ia.), 124; 4 Wheat., 1; 2 How., 127; 95 U. S., 303; 107 U. S., 163; Morse v. Churchman, 19 Vt., 613; 1 Rich. Eq., 99; 19 B. Mon., 814; Beall v. Drane, 25 Ga., 430; 2 Perry on Trusts, 687; Saltonstoll v. Sanders, 11 Allen, 446; 12 Gray, 82; Jackson v. Phillips, 14 Allen, 576; 53 Conn., 342; Bouvier's Law Dict., title, "Charitable Uses."

2. On limitation and laches: 5 Bush, 86; 2 Bush, 556; 7 J. J. Mar., 542; 5 Dana, 82; 7 B. Mon., 276; 1 Bush, 509; 2 Met., 148; Wood on Stat. Lims. 120; Duke v. Ambhurst, 20 Beav, 239; Brown v. Radford, W. N., 1874, p. 124; Marker v. Marker, 9 Hare., 16; 2 Ves. Jr., 584; 4 Bro. O. C., 114; Pickering v. Lord Stanford, 2 Ves. Jr., 272; Rivers v. Washington, 34 Tex., 267; Whitney v. Whitney, 5 Dana, 331; Hieronymous v. Mayhall, 1 Bush, 510; Rankin v. Turner, 2 Bush, 556; Board v. Jolly, 5 Bush, 87; Graves v. Graves, 2 Bibb, 207.

3. On the right of visitation in the testator's heirs-at-law. Chambers v. Baptist Educational Society, 1 B. Mon., 218.

4. On alternative pleading. Newman on Pl., 452-464; Worley v. Tuggle, 4 Bush, 168.

SAME COUNSEL IN REPLY TO THE PETITION FOR A REHEARING.

P. B. & UPTON W. MUIR FOR APPELLEES.

1. The testator having died in 1868, his will, devising all his estate to his executor "for charitable objects, to be expended for said objects in the Diocese of Louisville according to his discretion," is sufficiently certain, and is valid. *Id certum est quod certum reddi potest.*

2. The statute of charitable uses, as found in the Revised Statutes and in force at the death of the testator, must govern, and not the statute in force at the commencement of the suit.

3. The charity provided for in the will having been fully administered by the executor about twenty-four years before the commencement of the suit by the heirs-at-law, and this appearing from the averments of the petition, a demurrer to the petition should have been sustained. The claim as presented was barred by lapse of time and by the statute of limitations.

4. Petition insufficient. Pleadings discussed.
   Citations:

1. As to pleadings: Ky. Con., sec. 191; Chiles v. Drake, 2 Met., 148; Rankin v. Turney, 2 Bush, 556; Board v. Jolley, 5 Bush, 86; Stephens on Pl., rule 4, p. 387; rule 1, p. 377; Civil Code, sec. 113, sub-sec. 4; Newman on Pl., 452; Mitchell v. Mattingly, 1 Met., 239.

2. As to the validity of the will: Act of 43d Elizabeth, ch. 4; Gass & Bonta v. Wilhite, 2 Dana, 177; 1st. Rev. Stat., ch. 14,

sec. 122; 1st. M. & B. Stat., 308; Gen. Stat., ch. 13, p. 242; Dembitz Ky. Jur., 481-3; Ford v. Ford's Exrs., 91 Ky., 575; Moore's hrs. v. Moore's devisees, 4 Dana, 355; Curling's admr. v. Curling's hrs., 8 Dana, 38; Attorney-General v. Wallace, 7 B. M., 612; Moggeridge v. Thackwell, 7 Vesey, 36; Cromie Case, 3 Bush, 375; Kinney v. Kinney, 86 Ky., 611; Givens' admx. v. Shouse, 5 Ky. Law Rep., 419; Leeds v. Shaw's admr., 82 Ky., 79; Tichenor v. Brewer's exr., 17 Ky. Law Rep., 936; Bedford v. Bedford's admr., 35 S. W. R., 926; Howe v. Wilson, 91 Mo., 48; Chambers v. St. Louis, 29 Mo., 543; Russell v. Allen, 107 U. S., 163; Saltonstall v. Sanders, 11 Allen (Mass.), 446; Perry on Trusts, note to sec. 748; Whitman v. Lex., 17 Serg. & Raw., 93; Dom. and Foreign Miss. Soc.'s Appeal, 30 Penn. St., 434; Claypool v. Norcross, 15 Stewart (N. J.), 545; Hesketh v. Murphy, 8 Stewart (N. J.), 27; DeChamo v. Dobbins, 2 Stewart (N. J.), 43; Hunt v. Fowler, 121 Ill., 274; Garrison v. Little, 75 Ill. App., 402; Perry on Trusts, secs. 719, 731, 705, 703, 713, 732, 720; 20 Ore., 274; Pickering v. Shotwell, 10 Pa. St., 28; County of Lawrence v. Leonard, 83 Pa. St., 211; Mills v. Farmer, 1 Merivale, 55; Beach on Wills, 136; Story in Appendix to 3 Peters, 499.

**3.** As to limitation and lapse of time: John v. Smith, 91 Fed. Rep., 831; Newman on Pl., 280; Curtis v. Laken, 94 Fed. Rep., 253; Perry on Trusts, sec. 745; Hill on Trustees, p. 264; 137 U. S., 779; Angell on Limitation, sec. 469; 1 Wood on Limitation, ch. 6, secs. 60, 160; Bank v. Carpenter, 101 U. S., 567; Lansdale v. Smith, 106 U. S., 391; 137 U. S., 779; Peebles v. Reading, 8 Serg. & R., ——; Hunt v. Forman, 2 Dana, 471; Norris v. Haggin, 28 Fed. Rep., 275, 136 U. S., 386.

SAME COUNSEL FOR THE APPELLEES IN A PETITION FOR A REHEARING.

Citations as follows:

1. On the validity of the devise: Ford v. Ford, 91 Ky., 575; Moore's hrs. v. Moore's devisees, 4 Dana, 354; Genl. Stats., ch. 13, sec. 1; Gass & Bonta v. Wilhite, 2 Dana, 170; Maurice v. Bishop of Durham, 10 Ves., 535; 3 Peters, U. S. S. Ct., appendix, 499; Moggridge v. Thackwell, 7 Ves., ——; Johnson v. Schwann, 8 L. R. Chy. Div., 807; Chapman v. Brown, opinion by Sir Wm. Grant; Baker v. Sutton, 1 Kean, 226; Witcher v. Hume, 14 Beav., 509; Waldo v. Caley, 16 Ves., 206. By adopting the English statute, 43 Elizabeth, the Legislature silently adopted the construction which had been given to it by the English courts in the foregoing English cases, and all like cases in England. 3 Mon., 231; 91 Ky., 270; Pennock v. Dialogue, 2 Peters (old ed.), 18; McDonald v. Hovey, 110 U. S., 628; Smith's Com. on

Stat. and Com. Law, sec. 363; Interstate Com. Com. v. B. & O. R. R. Co., 145 U. S., 284; Brown v. Walker, 161 U. S., 600; 23 Am. & Eng. Ency. of Law, 432-3; Endlich on Interpretation of Statutes, 530, 371; Perry on Trusts, secs.720-709, 732; 2 Story's Eq. Jur., secs. 1155, 1156; Beach on Wills, 136; 26 S. E. R., 716; Cromie Case, 3 Bush, 375; Dembitz Ky. Jur., 483; Tichenor v. Brewer, 98 Ky., 352; Powell v. Hatch, 100 Mo., 598; Howe v. Wilson, 91 Mo., 45; Attorney-General v. Wallace, 7 B. Mon., 612; Kinney v. Kinney, 86 Ky., 611; Givens' admr. v. Shouse, 5 Ky. L. R., 419; Girard v. Philadelphia , 7 Wall, 1-15; Wood v. Payne, 66 Fed. Rep., 808; Saltonstall v. Saunders, 14 Allen (Mass.), 446; Claypool v. Norcross, 15 Stewart (N. J.), 545; Kesketh v. Murphy, 8 Stewart, 27; DeChamp v. Dobbins, 2 Stewart, 43; Witman v. Lex., 17 Serg. & Rawle, 93; Pickering v. Shotwell, 10 Pa. St., 28; County of Lawrence v. Leonard, 83 Pa. St., 211; Pell v. Mercer, 14 R. I., 417; Goodale v. Money, 60 N. H., 533; Everett v. Carr, 59 Me., 334; Fox v. Gibbs, 86 Me., 92; Miller v. Teachout, 24 Ohio St., 532; Haines v. Allen, 78 Ind., 100; Phillips v. Harrow, 61 N. W. R., 434; Quinn v. Shields, 62 Iowa, 140; Estate of Hickley, 58 Cal., 468; Garrison v. Little, 75 Ill., 402; Hunt v. Fowler, 121 Ill., 274; Burr's exrs. v. Smith, 7 Vt., 305.

2. On limitation and lapse of time: 1 Wood on Limitation, secs. 62, 160; Hunt v. Forman, 2 Dana, 471; Norris v. Haggin, 28 Fed. Rep., 275; Martin v. Gray, 142 U. S., 236; Frame v. Kenney's hrs., 2 A. K. Mar., 576; Angell on Limitation, ——; Hill on Trustees, side page, 265; 137 U. S., 779; Lansdale v. Smith, 106 U. S., 391; Sullivan v. Portland & K. R. Co., 94 U. S., 806; Coon v. Seymour, 71 Wis., 346.

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

In February, 1868, B. J. Spalding, a priest of the Roman Catholic Church, made his will, the validity of which is in question on this appeal. In August of the same year he died, domiciled in Jefferson county, and in the same month his will was admitted to probate. It is as follows:

"In the name of the Father, Son and Holy Ghost, Amen. I, B. J. Spalding, mindful of the uncertainty of life, do make and establish this, my last will and testament. I bequeath to my brother, the Most Rev. M. J. Spalding, Archbishop of Baltimore, all my real, personal and mixed estate; and all I may die seized of, *for charitable objects,*

*to· be expended for said objects in this diocese of Louis-ville, according to his discretion;* and I hereby appoint my said brother the sole executor, without any security. of this, my will. Done at Louisville, Ky., this 27th day of February, 1868, and signed in my own handwriting. B. J. Spalding."

By deed dated May 26, 1871, the devisee conveyed the estate to the appellee, the St. Joseph's Industrial School for Boys of the City of Louisville, a corporation which he had procured to be organized for the purpose under the general law. By this deed the will of B. J. Spalding was referred to, and the object of the devise recited in the language of the will. The deed further recited that "in the exercise of the said discretion the party of the first part doth carry out and apply the said trust as follows." Then follows a conveyance of the entire estate of the testator to the industrial school, "in trust, however, for the following charitable objects in the diocese of Louisville." Then follows a direction to pay the sum of $500 each to seven named charitable institutions, making an aggregate of $3,500. Then follows a provision that all the residue of the estate shall be held in fee simple and absolute right by the appellee corporation "for the purposes of its especial charity, as declared in its articles of incorporation," with power to sell and reinvest as the board of trustees might deem most advantageous, with a provision that, until the new institution should be founded and put in operation, the net income of the estate should be paid to the Orphan Asylum of St. Thomas, upon certain conditions; such appropriation of the income to in no event continue longer than five years from the date of the deed. It was then provided that after the establishment of the school the entire net income of the estate should be ex-

pended for its benefit, and if the school should not be put in operation, at least on a small scale, within five years, the board of trustees were to retain in their hands the entire income and estate for increase and reinvestment until the industrial school should "be actually established and opened with the approval and under the auspices of the Roman Catholic bishop of Louisville for the time being," after which the entire proceeds were to be applied to its maintenance. There was a further provision that none of the principal should be applied to the purpose of the corporation until the expiration of five years, and then not more than half of such principal.

The object of the corporation organized under the act of March 15, 1870, was declared to be "to receive and train up to virtue, industry and learning orphans and other destitute boys who may be committed to its charge at a house and on a farm to be obtained in Jefferson county, Kentucky, and to be called the St. Joseph's Industrial School for Boys of the City of Louisville." After providing in article 3 and 4 for a board of trustees and for officers, and the filling of vacancies in the board by the remaining members thereof, it was provided by article 5 that whenever, "with the approval of the Roman Catholic bishop of Louisville for the time being, the said industrial school mentioned in article 2 shall be opened and put into operation, the Roman Catholic bishop of Louisville and his successors shall have the full control and management of the discipline and regulation of said school, and he shall be *ex-officio* president of the board of trustees."

On January 30, 1895, appellants, who are a large number of the collateral kindred and heirs of B. J. Spalding, filed their petition in equity against the St. Joseph's In-

dustrial School, the trustees thereof, the Roman Catholic bishop of Louisville and the other heirs of B. J. Spalding. The petition waives all question as to the legality of the payments of $3,500 made to the various charitable institutions named in the deed, but seeks the division of the remainder of the estate and its accumulations among the heirs of the testator, upon the ground that the will is so vague and indefinite that it is impossible to ascertain the intention of the testator. The petition, as amended, further avers that the executor named in the will did not act in accordance with the intention of the testator in so far as it was expressed in the will, in that his deed did not provide for *expending* the estate of the testator for objects of charity, but, on the contrary, it provided that it should, in great part, remain unexpended; that while the articles of incorporation in the title seem to limit the benefits of the institution to boys of the *city* of Louisville, the articles do not limit such benefits even to boys of the diocese of Louisville, which embraces the greater part of the State of Kentucky, and there is no provision in the deed or the articles that the instruction and training provided for shall be gratuitous, or at a charge less than is usual in other schools. It further avers that the articles of incorporation were void, as not executed in accordance with the law; that the appellee corporation and its trustees have wholly failed to carry out the intention of the testator or the executor, by failing to take any steps to found the school, or to expend any part of the fund for the purposes named in the articles, but, in violation of the intent and direction of the testator and the executor, have converted the property into an untaxed perpetuity, answering no charitable purpose; that the delay of twenty-seven years since the death of

the testator, and of nearly twenty-four years since the con-
veyance of the property, was unreasonable and unneces-
sary, and in violation of the articles; and that the rights
of the corporation under its articles have lapsed by non-
user and failure to carry out the purposes of its incorpora-
tion. It is further averred that for these reasons the arti-
cles of incorporation are void and of no effect, under sec-
tion 191 of the present Constitution. A further complaint
is that the trustees are hostile to the establishment of
the school, and the appellee McCloskey, who, as bishop of
Louisville, is *ex officio* chairman of the board, and whose
approval is required by the articles to the establishment
of the school, is also unfriendly to the establishment there-
of, and has used his influence to prevent it.

This suit has two aspects; the prayer being for an ac-
counting for the estate and its increase, and a distribu-
tion of it among the heirs of the testator, and, further,
in the event the court should hold that the trust in favor
of appellee corporation is valid and enforceable, that the
trustees be directed to establish and put the school in
operation.

A motion to require the appellants to paragraph their
petition was overruled, and we think this action was prop-
er. The petition seems to us not to present two separate
and inconsistent causes of action, but merely to pray al-
ternative relief in the event the relief primarily sought
under the averments should not be granted.

Both a general and special demurrer were filed to the
petition as amended, and overruled; the trial court indi-
cating in an opinion filed upon the hearing of the de-
murrers that, while the heirs of the testator were not
entitled to have the will adjudged invalid for uncertain-
ty, and the estate distributed among them, they were en-

titled, as such heirs, to a right of visitation, to have an accounting of the estate, and to know the reasons for the delay in establishing the school provided for by the deed and the articles of incorporation.

The bishop of Louisville answered, denying that he had ever been president or a member of the board of trustees of the St. Joseph's Industrial School for Boys, or had ever obstructed or interfered with the corporation in the control or management of the trust fund; averred that he had withheld his approval of the establishment of the school because the trust fund was insufficient for its successful establishment; admitted that he did not think the discretion conferred upon the executor was wisely exercised, and that he would have preferred a different expenditure of the trust estate, and was pained at the unusual mode adopted by the executor; but denied that he was unfriendly to the establishment of the school, or had used his influence to prevent it, or had done anything to defeat the disposition of the trust estate provided for in the deed, or to obstruct the corporation in carrying out the objects of its incorporation. He further averred that he had been unwilling to approve the establishment of the school until the trust fund, which had been well managed, should be increased, and alleged that in from three to five years the school could be established upon a safe and permanent basis, but that if the court should be of opinion that the school should now be established, and should so direct, he would obey the order, although he would regard it as unfortunate for the institution.

The industrial school and the trustees thereof in their answer set up the will, the procurement by the executor of the incorporation, the conveyance by him to the corporation of the estate of the testator, much of which was alleged

to have been nonproductive at that time, and the payment of the specific gifts provided for in the deed of the executor out of the personalty, which payment left but a small sum in the possession of the corporation. It was further alleged that a lot on Grayson street, belonging to the estate, was still held by the corporation, being valued at $2,000; that certain lands in Texas were still so held, valued at about $5,000, and that a vacant lot in Louisville had been sold for $26,000; that the estate was increasing at the rate of $2,000 per annum, and, although the corporation had been unable, for want of sufficient funds, to establish the school, the trust fund would soon be sufficient for that purpose; that it was the desire and purpose of the corporation and the trustees to establish the school as soon as the funds in their hands would justify it; and that they were willing at any time to obey the order of court in regard to its establishment. The estate was alleged to have been worth not more than $15,000 at the date of the conveyance, and at the date of the answer to amount to a productive sum of about $49,000, in addition to about $6,000 of unproductive real estate. The answer alleges an earnest desire to establish the institution, and denies any hostility or obstruction on their part, or on the part of the bishop, to such establishment. The answer also denies in detail practically all of the allegations of fact or conclusions of law contained in the petition.

The issues were completed by replies and rejoinder.

Upon final hearing the trial court held the will to be a legal and valid disposition of the testator's estate, and the deed to the appellee corporation to be a legal and valid disposition and expenditure of the estate for charitable objects, but retained the case "for future order as

to the costs of this suit, and also in order that the court may see to the further due and proper execution of the trust, and to supervise, so far as necessary, the exercise of the reasonable discretion vested by the deed aforesaid in the defendant, the St. Joseph's Industrial School for Boys in the City of Louisville, and its board of directors; but in all other respects this judgment is final."

Upon this appeal it is insisted on behalf of appellees that the ruling of the chancellor was correct, except in retaining the case on the docket, (as to which a cross appeal had been prayed), and, further, that the statute of limitations, and the lapse of time after the probate of the will before the bringing of the suit, presented a complete defense to the relief sought in the petition, of which appellees could avail themselves upon the demurrer, although neither was pleaded or relied upon in the answers.

It is necessary to first consider the question whether the defenses of the statute of limitations and lapse of time can be considered on the demurrer in this proceeding.

The general rule in cases where the remedy only, and not the right, is destroyed by the statute of limitations, is "that the bar of the statute must be interposed by the diligence of the debtor, and as early as possible, and usually unless otherwise provided by statute, on the pleadings, previously to the hearing, and that it will not be raised by the court unsolicited, and also that the protection afforded by the statute may be waived by the debtor, the best possible proof of such waiver being a payment." (1 Wood on Limitations, section 7.) It is well settled in England that a person can not avail himself of the statute unless he set it up by the plea. (Id., note, and authorities there cited.)

In this State "the statute of limitations does not affect the validity of the contract, but the time of enforcing it;

or, in other words, it does not destroy the right, but withholds the remedy." (Graves v. Graves' Ex'r, 2 Bibb, 208; [4 Am. Dec., 697].

The general rule, therefore, would seem to be applicable, except in so far as it has been changed by our decisions.

In Chiles v. Drake, (2 Metc., (Ky.), 148, [74 Am. Dec., 406]), in an opinion by Chief Justice Simpson, it was said:

"The statute of limitations, being regarded as a matter of strict defense, must, if relied upon, be pleaded by the defendant in all actions, unless the petition shows that the action is barred by time, and that the plaintiff is not within any of the exceptions mentioned in the statute, when any exceptions are contained in the statute which prescribes the limitation. It is not necessary that the plaintiff should allege in the petition that the action has been brought in due time. This objection to the petition can not, therefore, be allowed to prevail, but must be deemed invalid."

In Hieronymous v. Mayhall, (1 Bush, 510), Judge Robertson used this language:

"As time never operates as a statutory bar unless relied on by plea, the plaintiff in the action need not anticipate such plea, and state facts to show that there can be no such bar; and consequently the nonstatement in the petition of any such fact is not an admission of the bar, nor even available on demurrer."

In Rankin v. Turney, (2 Bush, 556), in an opinion by the same judge, this court said:

"When time operates as a peremptory, and not merely as a presumptive bar,—as a statutory limitation, and not as evidence that there is no enforceable cause of action,—a general rule of pleading treats it as waived, unless pleaded as a statutory bar because, when not pleaded, the de-

fendant chooses not to put it in issue for litigation, and would therefore surprise the plaintiff, and frustrate the end of all pleading, by proof without plea. If pleaded, the plaintiff might avoid it by showing some saving or suspending disability, which he might not be prepared to do without notice that it would be relied on.

And consequently the only exception from the general rule is when the petition shows, not only a sufficient lapse of time, but the nonexistence of any ground of avoidance, which a plaintiff is not apt ever to do, and which was not done in this case."

In Board v. Jolly, (5 Bush, 86), the petition and the account therewith filed showed the action apparently barred by the statute of limitations; but the court, in an opinion by Judge Hardin, citing Chiles v. Drake and Rankin v. Turney, refused to apply the statute, saying:

"It does not appear from the petition that, if the statute had been pleaded, the plaintiff might not have avoided it by showing some saving or suspending disability."

It is to be observed that the exception to the general rule apparently recognized in the cases cited has not yet been applied in this State to defeat a cause of action. In all the cases, so far as we are informed, in which it has been sought to take advantage of the statute on demurrer, the decision has been adverse to that contention. It may be remarked that in one State, at least, where it is held the statute may be taken advantage of upon demurrer, it is required that the demurrer should call attention specifically to the fact that the statute is relied on, and that the general demurrer does not avail to raise the question. (Rivers v. Washington, 34 Texas, 267.)

It is confessed by appellee that there is a possibility

that saving disabilities existed in favor of some of the appellants, which were not excluded either directly by the averments of the petition, or by any argument to be drawn therefrom. But we are asked to apply the stat- ute piecemeal upon a general demurrer, to defeat the claims of a part of the appellants. This we are not willing to do. The demurrer is to the whole petition. Granting that the *dicta* in the cases cited are conclusive as to the existence of the exception to the general rule, and that it would be proper to apply the statute upon general de- murrer where the petition itself showed that the statute necessarily would deprive the plaintiff of any remedy, we do not think we should apply it unless this defense went to defeat the whole case as presented in the petition. And while it might not be error to apply the statute on demurrer in a case clearly coming within the exception to the general rule as stated, it assuredly is not rever- sible error to refuse to apply the bar on demurrer in a case like this, where the bar does not go to the whole case presented, and where, when the demurrer was overruled, appellees in their pleading wholly fail to set up or suggest this "matter of strict defense."

It should, perhaps, be remarked that an apparent ex- ception to the doctrine here stated is to be found in a class of cases where a cause of action is given by statute, and the statute prescribes the time within which it may be asserted. In this class of cases it has been held that the right and the limitation upon it go together, and, if the declaration shows the suit is not brought in the time with- in which the statute authorizes it to be brought, it is bad on demurrer. So, in actions against the Government under a statute authorizing a claimant to sue, if his action be brought within six years from the time the right of action

accrues the courts take notice of the statute, and that the statute itself is, in effect, a plea of the statute of limitations. "But in such cases it will be observed that the statute confers the right of action, and subjects the right to a condition, viz. that suit shall be brought within a certain time; and, unless the condition is complied with, the right does not exist. Kendall v. U. S., 14 Ct. Cl., 122;" (1 Wood on Limitation Action, section 7, p. 25, note 1).

To this class of cases apparently belongs the case (not cited by counsel) of Com. v. Equitable Life Assur. Soc., (100 Ky., 341, [38 S. W., 491]), which was a suit for a fine, the right to which was given the Commonwealth by section 656, Kentucky Statutes. In that case the question which of two statutes of limitations should be applied was decided on demurrer, without, however, any argument or discussion of the question here presented,— whether the statute *can* operate as a bar on demurrer. But in that case the statute was not sought to be applied to a cause of action arising, under the common law, out of contract or the relations of the parties, but to one given by the statute as a penalty for violation of law; and so, taking notice of the statute giving the right, the court might take notice, also of the statute fixing and limiting the time within which the right might be asserted, to which limitation there were no exceptions.

Nor, in our opinion, does the defense of lapse of time, here for the first time relied upon, bar this proceeding. Lapse of time when it does not operate as a positive bar under the statute of limitations, operates by creating a presumption that the party has abandoned his rights, or that his demand has been satisfied. The latter presump-

tion, we believe, is never raised except in cases where payment has been pleaded. And, though the weight of authority seems to be to the effect that it is not necessary to plead *laches*, there is respectable authority in Illinois and some other States that advantage must be taken of this defense by some appropriate form of pleading; and it has been held that, if not relied upon in the trial court, it will be considered waived on appeal. (Humphreys v. Butler, 51 Ark., 351, [11 S. W., 479]; Dawson v. Vickery, 150 Ill., 398, [37 N. E., 910].)

But, without undertaking to pass upon these questions, it seems manifest that, when lapse of time does not operate as a statutory bar, it can be applied only by raising a presumption of assent to the existing status, under such circumstances as to prevent substantial justice being done between the parties, in which event the courts will declare the relief sought inequitable, or in cases where, on account of the gross neglect and *laches* in bringing the suit, the disturbance resulting from the establishment of the claim would make it a matter of public policy that the offending party shall abide the consequences of his own failure. Knowledge by the party of his rights, or at least the existence of circumstances which should have induced an inquiry, seems to be a prerequisite to the application of this doctrine. (Hannon v. Hounihan, 85 Va., 429, [12 S. E., 157].)

In 1 Wood on Limitations, section 61, it is said, quoting from Lord Cottenham in Duke of Leeds v. Amherst, 2 Phillips Ch., 123:

" 'If a party having a right stands by and sees another dealing with the property in a manner inconsistent with that right, and makes no objection while the right is in progress, he can not afterwards com-

plain. This,' says he, 'is the proper sense of the word "acquiescence."' But a person who has not complete knowledge of the facts can not be said to acquiesce. 'I do not see,' says Turner, L. J., 'how a man can be said to have acquiesced in that he does not know; and in cases of this sort I think that acquiescence implies full knowledge, for I take the rule to be quite settled that a *cestui que trust* can not be bound by acquiescence unless he has been fully informed of his rights, and of all the material facts and circumstances of the case.' "

Mr. Wood refers to the case of Marker v. Marker, 9 Hare, 16, in a note to this passage saying:

"*Laches* can not be imputed where the party had no knowledge of the facts which constitute his ground of action; and this is the case although the party might have ascertained the facts by due inquiry if by any act of the defendant, or the circumstances, he had reasonably been lulled into security."

In this case a lack of knowledge of the facts upon which appellant's claim is based was averred in the petition; and while, under the circumstances of this case appellants might be held to a stricter accountability for failure to make inquiry in regard to the facts, had their delay worked wrong to appellees, we are of opinion that a sufficient excuse for the delay has been shown, in view of the fact that the relative position of the parties has not been altered to appellee's prejudice.

In Wollaston v. Tribe, L. R. 9 Eq., 44, Lord Romilly said:

"Great stress was laid on the lapse of time, but I think nothing of that, because all the persons interested are in the same State now as they were then. If there had been any dealing with an altered state of matters, that might have raised a question; but there is nothing of that sort."

And in *ex parte* Anderson, 8 Ch. Div. 807, it was said:

"Nobody ought to be estopped from averring the truth or asserting a just demand, unless by his acts or words, or neglect, his now averring the truth or asserting the demand would work some wrong to some other person, who has been induced to do something, or to abstain from doing something, by reason of what he has said or done, or may say or do." And in Daggers v. Van Dyck, 37 N. J. Eq., 130, it was said:

"The delay of the complainant in seeking redress constitutes no defense. It is only when the complainant has slept over his wrongs so long that great and serious wrong will be done to the defendant that *laches* constitutes a complete defense. Here the parties are in almost exactly the same position now as they were at the time the wrong for which redress is sought was done, and relief may be given to the complainant without doing any harm whatever to the defendant."

In this case appellees have not been induced to enter into any obligation or incur any expense which can not be provided for by the delay in bringing the suit. So far as appellees are concerned, they are, as to the relief sought in this case, in practically the same position as they were had the suit been brought immediately upon the execution of the deed.

As said in 1 Wood on Limitations, section 60:

"Lapse of time, in equity, is permitted to defeat an acknowledged right only on the ground of raising a presumption that the right has been abandoned; and this presumption will never prevail against opposing facts and circumstances outweighing it."

And in this State it has been frequently held that the presumption which arises from the lapse of time is barely

a presumption of fact, which may be repelled by proof of other incompatible facts. See Reardon v. Searcy's Heirs, 1 Litt. (Ky.), 53; Tibbs' Heirs v. Clark, 5 T. B. Mon., 526.

We conclude, therefore, that lapse of time does not in this case, present a bar to appellants' claim, if otherwise maintainable.

We come now to consider the case upon its merits, the question being whether the will under consideration is too vague and indefinite in its terms to be sustained. In determining this question, it is unnecessary to go into an elaborate review of the history of the doctrine of equity jurisdiction over charitable trusts.

Prior to 1601, equity had jurisdiction of charitable, as of other, trusts; and in that year the statute (43 Eliz., c. 4) called the "Statute of Charitable Uses" was adopted, which, by its enumeration of charities, furnished a standard to determine what purposes are deemed charitable, repealed *pro tanto* the mortmain statutes theretofore adopted, and created a new jurisdiction ancillary to the existent equity jurisdiction. A full discussion of the effect of the statute upon the chancery jurisdiction over this subject may be found in the opinion of Mr. Justice Story in Vidal v. Girard, etc., (2 How., 127; [11 L. Ed., 205]), and the opinion of Lord Reddesdale in Attorney General v. Dublin, (1 Bligh (N. S.), 312); Morice v. Bishop of Durham, (9 Ves., Jr., 405). In Kentucky, the statute, being of general application, and enacted prior to 4 Jac. I., was a part of the common law; was constructively repealed, but substantially re-enacted in our statute of charitable uses (1 Rev. St., pp. 77, 235). But in England, in addition to the jurisdiction of the chancellor as a court to administer trusts before

and independent of the statute, as well as by virtue of its provisions, that functionary possessed another power, not judicial, but ministerial, over charitable trusts; for, as keeper of the king's conscience, under the king's sign manual, he exercised the king's prerogative power as *parens patriae* to control and carry into effect gifts to charity in general, without any specific purpose being indicated, and to devote gifts made for charitable uses which were illegal, or contrary to public policy, or impossible to be carried into effect, to such other charitable purposes *cy pres* the original gift, as he pleased. (Moggridge v. Thackwell, 7 Ves., 36b; Perry on Trusts, section 717 *et seq.*) Under this prerogative power, charitable devises in England which happened to be illegal under the statutes have been applied to purposes directly opposite to those intended by the donor, and expressed in the gift: "No such power," says Mr. Perry (section 718), "exists in any American magistrates, judicial or ministerial, and none can exist until it is conferred by the Legislature. The cases named are not law in America, and probably nothing like them will ever have a place in its jurisprudence."

Mr. Perry (section 723) insists upon the distinction between the *cy pres* doctrine as a rule of construction for the court, and therefore its exercise as a judicial function, and as a rule of administration, which is, of course, ministerial. In England, as the same officer, the chancellor, exercised the prerogative power of the king, as his minister, and also the judicial power of the court of chancery, and his actions in each behalf are reported in the same books, it became immaterial to distinguish between the power as exercised by the chancellor personally and that exercised judicially.

And so, as said by Mr. Perry (section 718), "no very

clear line has been drawn between those established by him exercising his ordinary judicial powers in the court of chancery, and those established by the extraordinary or prerogative powers of the crown exercised through the chancellor. . . . The instances in which such prerogative powers were exercised are reported in the books together with judicial determinations, and thus much misapprehension and confusion have arisen." For this reason the English authorities upon this subject may be misleading in a State where no such prerogative exists.

The authorities upon this subject in the various states are as conflicting as they are numerous. In some of them, as Massachusetts, the doctrine of which State is naturally favored by Mr. Perry, the judicial doctrine of *cy pres* has been so extended as almost to equal the exercise of prerogative power in England. (Jackson v. Phillips, 14 Allen, 576). In other States, as New York, far greater definiteness in the charitable purpose is required. (Tilden v. Green, 130 N. Y., 29; [27 Am. St. R., 487; 28 N. E., 880; 14 L. R. A., 33].)

But there have been a number of cases touching upon this subject decided in this State, and the principles deducible from them are, in our judgment, conclusive of the case at bar. All of the Kentucky cases have sustained the charitable uses therein considered, because the court held that a definite charitable object was indicated, or a class of charitable objects designated, from which choice was authorized to be made. In some of the cases there are loose and possibly inaccurate statements of the derivation of the jurisdiction. In some of them there is room for difference of opinion as to the certainty of the objects of the charitable uses sustained; but the court has always held that they were certain, either as being designated by the donor, or

one of a class designated by him from which choice was authorized to be made.

And this is in strict accord with the doctrine laid down by Chief Justice Robertson in Moore's Heirs v. Moore's Devisees, 4 Dana, 354; [29 Am. Dec.,417]. In that case the law was laid down after a more careful and exhaustive examination of the authorities than is to be found elsewhere in the Kentucky Reports. Said the court (page 367):

"We are satisfied that the *cy pres* doctrine of England is not, or should not be, a judicial doctrine, except in one kind of case; and that is where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal or inappropriate, or which happens to fail, has been prescribed. In such a case a court of equity may substitute or sanction any other mode that may be lawful and suitable, and will effectuate the declared intention of the donor, and not arbitrarily and in the dark, presuming on his motives or wishes, declare an object for him.

"A court may act judicially as long as it effectuates the lawful intention of the donor. But it does not act judicially when it applies his bounty to a specific object of charity selected by itself, merely because he had dedicated it to charity generally, or to a specified purpose which can not be effectuated; for the court can not know or decide that he would have been willing that it should be applied to the object to which the judge, in the plenitude of his unregulated discretion and peculiar benevolence, has seen fit to decree its appropriation, whereby he, and not the donor, in effect and at last, creates the charity."

And in the same case, on page 365, stating the class of

charitable uses which the courts in Kentucky will effectuate, it is said:

"When an ascertainable object is designated by the donor in general or collective terms, as the poor of a given county or parish, or when a person is appointed by him to select a described portion or kind or number from a designated class, the chancellor, sitting as judge in equity, will interpose on the ground of trust."

Under this doctrine every charitable use which has been sustained in Kentucky is sustainable. Beyond this doctrine the court has never gone. A brief examination of the Kentucky cases will illustrate this.

In Gass, &c., v. Wilhite, 2 Dana, 177; [26 Am. Dec., 446], in an opinion by Judge Nicholas, it was stated that "where the objects of the charity, and the mode of its application, are pointed out, but not with sufficient distinctness or certainty to be specifically and accurately enforced, the court will, under its *cy pres* doctrine, give it effect as near the general intent as may be; and even where there is no specific mode or object pointed out, and in some cases where the object fails or ceases to exist, the court will, in respect of the general charitable purpose, devise a mode itself for giving it effect and employing the charitable funds." In the *dictum* quoted the court appears to have assumed that the English *cy pres* doctrine was adopted in Kentucky. But this doctrine was practically overruled in Moore v. Moore, and the facts of the case did not at all require the announcement of this doctrine. The question in that case was merely whether the elaborate covenant which constituted the articles of association of a Shaker society made that society a charitable institution, which it undoubtedly was, and was so decided to be.

In the Moore case, referred to *supra*, a testator made a devise over for "a fund for educating some poor orphans for this county (Harrison), to be selected by the county court, who are the guardians of such, and to be confined to such as are not able to educate themselves. This was sustained, as we have seen, upon the ground that the object was charitable, and that power was given to select from a designated class.

In Curling's Adm'rs v. Curling's Heirs, 8 Dana, 38, [33 Am. Dec., 479], the gift under consideration was for the use, privilege and benefit of a public seminary; and it was held that a public seminary of the testator's home county was intended by the devise.

Said Chief Justice Robertson in this case:

"And, as the testator has manifested an intention to dedicate his estate to one specified class of objects embraced by the statute, if his bounty can be applied to any single object within that class, consistently with his declared purpose, and without the hazard of violating his will or of making a will for him, there is no doubt that a trust exists which may be lawfully executed, and judicially upheld and enforced."

The next case was that of Chambers v. Baptist Educational Society, 1 B. Mon., 215, simply deciding that courts of chancery may enforce the performance of trusts confided to corporations, and that subscriptions made in aid of a trust fund, the purpose and object of which had been designated by the founder, were to be held and used as a part of the trust fund, subject to the same control, and no other.

In Attorney General v. Wallace's Devisees, 7 B. Mon., 617, a devise "to such charitable and benevolent insti-

tutions as may appear to be most useful in disseminating the Gospel at home and abroad," was sustained upon the ground that a codicil appointing trustees to hold in trust for "the purposes and persons therein named" (i. e. in the will) vested in his "trusty friends" the power of selection of such charitable and benevolent institutions established for the dissemination of the Gospel as might appear *to the executors* most useful and efficient for effecting the object. In this case, although decided upon authority of English cases, such a construction was given to the testator's language as to bring the case within the rule laid down in Moore's Heirs v. Moore's Devisees; for the court held that there was a designated class of objects, viz.: charitable and benevolent *institutions* for disseminating the Gospel, from which choice was authorized to be made,

Mr. Perry says in a note to section 748, "This case goes further than any other case observed in the United States." He says this upon the ground that it was "a general gift to charitable and religious purposes, without trustees, and without any machinery pointed out or referred to by which the trustees were to be appointed." But it will be observed that this court decided the case upon the ground that it was a devise to a designated class of charitable and benevolent *institutions*, and that trustees were appointed to select from that class.

In Cromie's Heirs v. Louisville Orphans' Home Society, 3 Bush, 374, the opinion was written by Judge Robertson, and again repudiates the "ultra judicial *cy pres* doctrines which royal prerogative attached as excrescences to the statute of Elizabeth." Said the court there, quoting from the New York court:

" 'That *cy pres* power which constitutes the peculiar feature of the English system, and is exerted in determining

gifts to charity when the donor has failed to define them, and in framing schemes of approximation near to or remote from the donor's true design, is unsuited to our institutions, and has no existence in the jurisprudence of the State on this subject.' This means that in New York the application of charities is strictly *judicial*.

"And in Moore v. Moore, 4 Dana, 366; [29 Am. Dec., 417], this court said: 'We are satisfied that the *cy pres* doctrine is not, and should not be, a judicial doctrine, except in one kind of case,—where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal or inappropriate, or which happens to fail, has been prescribed.' "

In that case definite devises had been made to two definitely named charitable institutions, but the names by which they were called in the will were erroneous. It was held that under the facts of that case the definite objects of the testator's bounty were ascertainable, and the charitable uses were sustained.

Leeds v. Shaw's Adm'r, 82 Ky. 80, was a devise to trustees of a designated school district, in trust to be expended in the education of poor children, and towards the mainte. nance of a good school in said district. This was properly sustained.

Kinney v. Kinney's Ex'r, 86 Ky., 610, [6 S. W., 593], was a devise "to the Methodist Episcopal Church South, to be applied to foreign missions, . . . to their use and benefit exclusively." This devise was held valid, notwithstanding the statute forbidding a church from taking title to over fifty acres of land, upon the ground that that statute was intended to prevent the church from holding such land for its own use. As to the objection made for vagueness, the court said, "The trustee is named in

the will, and the language used by the testator indicates definitely the purpose to which he desired his bounty to be applied."

Penick v. Thom's Trustee, 90 Ky., 668, [14 S. W., 830], was a case where there was a devise to a trustee for the benefit of the Orphan Home of the Episcopal Church of the Ascension, in Frankfort; and it was held that, though the title to the house which was used as a home for needy orphan girls of the church was not in the church, the devise was for the benefit of such orphans, it being perfectly ascertainable that the devise was intended by the testator to be for their benefit.

In Ford v. Ford's Ex'r, 91 Ky., 572, [16 S. W., 451], there was a devise for a monument for the testator. It was unnecessarily held in that case that the building of the monument was a humane purpose. Such a devise, however, would seem to have been sustainable under the law as administered before the statute of Elizabeth.

In Givens' Adm'r v. Shouse, the syllabus of which is given in 5 Ky., Law Rep., 419, the opinion shows the devise to have been to trustees, to be devoted by them to such benevolent objects as they may select, with a request which makes the devise a precatory trust, "to give preference to charities connected with, or under the control of, the Christion Brotherhood."

In Tichenor v. Brewer, 17 Ky. L. R., 936, [33 S. W., 86], the devise was "to the Roman Catholic bishop of the city of Louisville, to be by him used for the benefit of the Roman Catholic charitable institutions in his diocese." It is only necessary to quote the language used in the devise to show that it was sufficiently definite, under the rule which we deduce from the authorities of this State.

In Bedford v. Bedford's Adm'r, 18 Ky. L. R., 195, [35 S.

W., 926], the devise in question was "to the State of Ken-
tucky, in trust that the State will forever hold the same for
the use and benefit of the children of the State that the said
State will invest said money in some profitable bank stock,
and the proceeds therefrom I desire to be appropriated an-
nually forever towards the education of the children of the
State of Kentucky, particularly the poor and most unintel-
ligent. I desire that this money constitute a permanent
school fund, and the interest from this fund be appropria-
ted annually toward the education of the children of this
State." And here, again, it is only necessary to read the
language used, to see that a class of beneficiaries was des-
ignated for whose benefit the trustee created was to ex-
pend the interest of the fund.

And in the case of Crawford' Heirs v. Thomas (this day
decided), [54 S. W., 197], the devise is sustained, and can be
sustained, only upon the ground that a definite purpose was
indicated by the testatrix, and was ascertainable from her
will, viz. the employment of evangelists to advance the
principles of primitive Christianity as taught by the Chris-
tian Church, a religious body well known in this Common-
wealth.

The case at bar presents a very different question from
any of the Kentucky Cases. It is a devise to charity gen-
erally, "for charitable objects, to be expended for said ob-
jects in this diocese of Louisville, according to his [the
executor's] discretion." It may be that, if a class of charit-
able objects had been designated which included both public
and private charities, the court would, in favor of one of
those "peculiar favorites of modern jurisprudence," pre-
sume that those charities of the class which were public
were intended. But it does not do that. It selects no
class or individual out of the wide range of objects which,

under the decisions of this court, can be considered charities. It does not even provide that it shall be given to a charitable use, the provision being that it shall be *expended* for charitable objects. We can not tell whether the object selected by the executor would be approved by the testator, for no guide is left us by him from which to ascertain his desire.

After a careful consideration of this will, we are constrained to the conclusion that it amounts to nothing more than a power-of attorney to make a will for the testator, and that this can not be done in Kentucky. It is far more vague and indefinite than the will in Attorney General v. Wallace's Devisees, *supra*, in which case this court went to the furthest limit to which it is inclined to go, even to sustain charitable uses,—those favorites of courts of equity.

These, without elaboration, are the conclusions we have reached.

But, though the judgment must be reversed, and the will adjudged invalid for uncertainty, it is manifestly equitable that all expenses of caring for the property should be paid, and reasonable compensation made for the management of the property, which seems conceded to have been well and faithfully administered.

The judgment is reversed, and the cause remanded, with directions to enter a judgment in accordance with the views herein expressed.

CHIEF JUSTICE HAZELRIGG AND JUDGES PAYNTER AND BURNAM DISSENT.