85  429
91  508

85  429
100  673

85  429
101  792

# Staunton.

## HANNON AND ALS. V. HOUNIHAN AND ALS.

### September 20th, 1888.

1. ALIEN HEIRS—*Alien ancestor—No bar.*—By Code 1873, ch. 119, § 4, it is provided that in making title by descent, it shall be no bar to a party that any ancestor (whether dead or living), through whom he derives his descent from the intestate, is or.hath been an alien.

2. NATURALIZED CITIZEN—*Citizens of another State—Rights and privileges.*—A naturalized citizen of U. S., or a native citizen of another State, is entitled to all the rights and privileges of a citizen of this State. *Com'th* v. *Towles,* 5 Leigh, 806.

3. PAROL CONTRACTS—*Ante-nuptial.*—By cl. 5, § 1, ch. 140, Code 1873, it is provided that no action shall be brought upon any agreement made upon consideration of marriage, unless the agreement be in writing, signed by the party to be charged thereby or his agent;

HELD:

   This section embraces ante-nuptial contracts.

4. RESULTING TRUSTS—*Husband and wife—Case at bar.*—Previous to the married woman's act (April 4th, 1877), where a woman, having money not settled to her separate use, marries, and husband purchases with it real estate, and takes conveyance in his own name;

HELD:

   No trust results in wife's favor.

5. DOWER—*Mansion and curtilage—Adverse possession—Statute of limitations—Case at bar.*—By § 8, ch. 106, Code 1873 (Code 1887, § 2274), widow being entitled to hold mansion and curtilage until dower assigned;

HELD:

   Her possession, not being adverse, will not in law be so deemed, and statute of limitations will not begin to run until such possession ends, or she publishes her claim and her possession to be adverse and hostile by actual and open disseisin.

6. LACHES.—Parties being ignorant of their rights cannot be charged with *laches.* *Lamar* v. *Hale,* 79 Va. 143.

Appeal from decree of circuit court of Augusta county, entered on the 24th of June, 1886, in the suit wherein John Hounihan and others were complainants, and the appellants, Patrick Hannon, Cornelius Hannon, John O'Niel, Michael Gilmartin and Mary, his wife, James Daley, Isaac Daley, Ann Daley and Nicholas Daley, the last three being infants, were defendants. The object of the suit was to quiet the title to a certain house and lot in the city of Staunton.

The complainants claimed the property as devisees of Rosanna Hannon. The defendants claimed it as the heirs of James Hannon, deceased. The suit was, by agreement, prosecuted in the form of a suit in equity, instead of in the form of an action of ejectment. The case is, therefore, to be treated as if the heirs had been plaintiffs in ejectment, and the devisees defendants therein.

James Hannon, a native of Ireland, became a naturalized citizen of the United States, and in July, 1858, married Rosanna, widow of Peter Critchard, deceased; and in October, 1858, said James Hannon bought at public auction, from Geo. M. Cochran, Jr., trustee, the property in controversy, and paid in cash one-third of the purchase-money. The legal title was conveyed to him by the trustee, to whom he reconveyed the same to secure the purchase-money remaining unpaid. The title still remains in the trustee, though the balance yet unpaid is inconsiderable, in consequence of additional payments made by James Hannon in his life-time, and, since his death, out of the proceeds of the sale of part of the lot of land in question.

In June, 1861, James Hannon died, intestate and without issue, but leaving surviving him his widow, Rosanna, and, as his next of kin, the said Patrick Hannon and the others, who were the defendants below. Patrick was naturalized as a citizen of the United States in October, 1854, and the other defendants below, except Cornelius, were children of Johanna, sister of James, and born in the United States. John O'Niel and Mary Gilmartin, his sister, were born in 1858 and 1859, respectively; whilst the Daleys were born after the decease of James Hannon

in 1861.   Cornelius resided in New York from the time of his arrival in America, and appears not to have become a naturalized citizen.   The rest have resided in Illinois from 1861, or since their birth.

Rosanna Hannon remained in possession of the property in controversy from the death of her husband, James Hannon, until her own death, in 1876.   She made a will, by which she gave to John Edward Hounihan, the infant son of John and Catherine Hounihan, "all of her estate and property of every kind and description," but did not expressly bequeath or mention the house and lot in question.   In the event of the son's death under age, unmarried and without issue, the property should be his mother's.

In addition to the aforesaid facts, the bill also stated that when James and Rosanna were married, he was twenty-eight years of age, illiterate, dull, intemperate, and a day laborer without means, and that she was at least forty-five years of age and possessed of several thousand dollars, which had been devised to her absolutely by her first husband; that her last husband, James Hannon, had purchased the property in controversy for $3,250, paid one-third cash, and gave his bonds, payable in one and two years in equal instalments, for the residue; that the cash payment and all other payments were made with the money of his wife, Rosanna, except those made with the proceeds of the part sold.

The bill also stated that, by an ante-nuptial agreement between them, all property then owned by her, or afterwards acquired by her, should be the absolute property of the survivor.   It, moreover, set forth that James Hannon left surviving him no blood kindred, either in this country or in his native land; that he died intestate, and that his wife, Rosanna, was his heir under the laws of this State; and that, *as such heir*, she held possession of the house and lot openly, notoriously, continuously and hostilely against all the world, from her husband's death to her

own decease; and that she had, conjointly with the trustee of James Hannon, conveyed a strip of the lot to A. B. Arthur by deed dated 1st September, 1870, wherein she described herself" as *the heir at law of James Hannon.*

The adult heirs answered this bill and denied, or disavowed knowledge of the matters and things alleged, and call for proof of every material allegation. They claim to be the true next of kin and the lawful heirs of the decedent, James Hannon; and they say that Johanna, his sister, was twice married, and that she died in Illinois, in 1880, without having become a naturalized citizen, but that her children were all born in the United States; that Rosanna held possession of the house and lot as the widow of James Hannon, and was entitled to hold same until her dower was assigned her; and that her possession did not amount to an ouster of the estate by descent of the heirs at law.

Numerous depositions were taken on both sides. The cause came on to be heard on the bill, the answers of the adult, and the answer of the infant defendants by their *guardian ad litem,* the exhibits and depositions, and on the bill taken for confessed as to the trustees, George M. Cochran, Jr., and James C. Cochran, and on the arguments of counsel.

On consideration whereof, the circuit court decreed that the complainants, Catharine Hounihan and her infant son, John Edward Hounihan were entitled to the house and lot in the bill and proceedings mentioned, under and according to the terms and provisions of the will of Mrs. Rosanna Hannon, against the claims and demands of the defendants, Patrick Hannon and others, and to recover of those defendants the costs of this suit, and that the trustee, George M. Cochran, Jr., should convey said house and lot to said Catherine and her son, by deed with special warranty, upon the payment of the balance of the purchase money thereon, as to the amount of which there was dispute. From this decree the defendants below obtained an appeal and *supersedeas.*

*Sheffey & Bumgardner,* for the appellants.

*Elder & Nelson,* for the appellees.

RICHARDSON, J. (after stating the case), delivered the opinion of the court.

We come now to consider the several points involved in this appeal. It is undeniable that the evidence positively proves that the appellants were, at the time of the death of James Hannon, the nearest of his blood kindred, and that Patrick was a naturalized citizen, and John O'Niel and his sister, Mary Gilmartin, children of Johanna, who was not naturalized, were born in the State of Illinois, and were in being at the time of the death of James Hannon. And it is clear that they were capable to take, as his lawful heirs, any property whereof he died absolutely possessed, or seized in fee.

This court, in *Commonwealth* v. *Towles,* 5 Leigh, 806, expressly decided that a person born in another State of this Union is entitled to all the rights and privileges of this State. Indeed, such is both the spirit and letter of the Federal constitution. See also, 1st Tuck. Com. 57; 1st Minor's Inst. 130. And the doctrine prescribed by our own statute is, that children born in this State can inherit through living alien ancestors. Hence it follows that, if children born of alien parents residing in this State can inherit real estate here, such children, born in Illinois, may do the same in Virginia. 1 Lomax Dig. pp. 92, 584-5; *Jackson* v. *Saunders,* 2 Leigh, 108. It is, therefore, manifest that Rosanna Hannon could not inherit the property in controversy as the heir of her deceased husband, James Hannon, because, at his death, he had blood kindred who were capable of inheriting and whom the law prefers to her; and thus one of the grounds upon which her devisees base their claim, is wholly removed.

On behalf of the appellees, it is also insisted that there was

an ante-nuptial contract between Rosanna and James, whereby they agreed that "whichever lived the longest was to have the property." But of such contract there seems to be a signal absence of proof in the record. The only evidence in any way bearing on such contract is the testimony of the witness, McAleer. He says: "When I got home I understood that Hannon had been sick. I went to see him. He had then gotten better. Mrs. Hannon, in the course of conversation, told me that in his ravings he had said that if anything happened to him his friends would be coming looking after that property. That she said: 'James, that is not the contract you and me made when we got married. The contract was that whichever lived the longest was to have the property.' James Hannon laughed over her bringing the contract into the conversation. From the way he laughed over it, I thought he acquiesced in it, but he did not say yes or no."

It cannot be seriously pretended that such testimony proves the alleged ante-nuptial contract. Nor is McAleer's evidence aided by that of the witness, Kurtz, who says: "I heard them both talk about the property. Well, she said it was her property and that she wanted it fixed in her name, and he said that he also wanted it fixed in her name."

Whatever was, or may have been the inclinations of one or both of them, the unyielding fact remains—the property was never "fixed in her name," if by such expression was meant conveyed by deed to her, or for her benefit. Indeed, it is not pretended that the alleged contract was ever reduced to writing; but it is claimed that a parol ante-nuptial contract will be enforced at the instance of either party, when satisfactorily proved. Just here lies the trouble; and as the alleged contract in this case is not *satisfactorily proved,* it will suffice to dismiss the subject with a mere reference to the statute, § 1, ch. 140, Code 1873, where it is declared that "any agreement made upon the consideration of marriage" is invalid unless the same be in writing, etc. And there could be no departure from the statutory rule

where there has been no fraud and no agreement to reduce the settlement to writing; but if the wife has placed reliance solely upon the honor, word, or promise of the husband, no relief will be granted; for in such a case the party chooses to rest upon a parol agreement and must take the consequences. And in such case the subsequent marriage is not deemed a past performance taking the case out of the statute, contrary to the rule which prevails in other cases of contract. See 2d Story's Eq. Jur. 768.

It is also insisted that James Hannon made the cash payment with his wife's money, and that there was clearly a resulting trust in her favor. The most careful search of the record fails to disclose any evidence whatever of this claim. For outside of the mere statements of witnesses that she said so, there is nothing that tends in the least to uphold this contention; and it is plain that her self-servient declarations cannot be adduced as evidence in behalf of her devisees. But this money of Mrs. Hannon was the money which she acquired as widow and distributee of her first husband, Critchard. She possessed no separate estate in that money. It became the property of James Hannon, *jure mariti*, so soon as he laid hands on it. And if with this money he paid for the property in controversy, he invested therein his own, and not his wife's money.

The appellees, in their bill, did not expressly set up the bar of the statute of limitations to the right of entry, or the right to recover, of the heirs of James Hannon. But they say in their bill that James Hannon had died intestate, leaving surviving him no blood kindred either in this country or in his native land; that his wife, Rosanna, was his heir-at-law; that as such heir-at-law she held possession of the house and lot from the death of her husband to the time of her own decease, continuously, openly, notoriously, and hostilely; and that since her death the appellees had, under her will, held similar possession. And it is very likely that the decree of the court below was

based on the idea of such adversary possession for a period of fifteen years before suit brought, as a bar against the claims of the next of blood kin of James Hannon.

After careful examination of the authorities and consideration of this point, we have arrived at the conclusion that the decree of the circuit court cannot be sustained even on that ground. As we have seen, the bill does not declare that Mrs. Hannon held possession under any claim founded on the alleged ante-nuptial contract, or upon the alleged resulting trust created in her favor, it is said, by the use of her money in the payment of the purchase price of the property, but solely on the pretence that as James Hannon had died intestate without any blood kindred capable of inheriting real estate in Virginia, Mrs. Hannon was his heir-at-law, and held possession as such heir. This claim is founded upon the tenth section of the statute of descents, which prescribes that: "If there be neither maternal nor paternal kindred, the whole shall go to the husband or wife of the intestate." It is obvious, therefore, that the statute affords no sufficient aid to the contention.

Nor can it be seriously contended that such a claim, or such a possession, is adverse and hostile to the claim of the heirs of the higher class in the course of descents, as it is plainly founded on the mistaken supposition that no heirs of such higher class existed, and was in manifest subordination to the claims of that class if it turned out that any such did exist. See Code 1873, ch. 119, § 1.

At the death of her husband the possession of the property in controversy devolved upon the widow, Mrs. Rosanna Hannon, and she continued in possession on the supposition, though an erroneous one, that she was his lawful heir—not adversely, but in subservience to the superior claims of his blood kindred, should any such present themselves. This she claimed in 1869, in the deed conveying, in conjunction with the trustee, Cochran, a strip of the lot to Arthur, which was sold in order that the proceeds might go on the unpaid purchase-money.

Again, Mrs. Hannon was in possession of the property as widow entitled to dower in the real estate of which her husband had died seized in fee simple. "Until her dower was assigned her, she was entitled to hold, occupy and enjoy the mansion and the curtilage free of charge." In this case, "mansion and curtilage" embraced all the real estate whereof her husband died seized as of fee. Therefore she was entitled to hold, occupy and enjoy the whole of the property here in controversy until her death, as dower was never assigned.

Now, it is an elementary principle that, "when a party is in actual possession, and has a right to the possession under a legal title, which is not adverse, the possession will not in law be deemed adverse." 2 Starkie, 657; *Doe d. Milner* v. *Brightman,* 10 East, 583, a case very similar to the case at bar. In that case the property belonged to Lady Harwood, who died without issue, leaving her husband surviving her. He had the property for a period equal to the bar of limitations had his possession been adverse. There had been a settlement whereby the property was limited, upon failure of issue, to the survivor in fee. Issue failed. Lord Harwood survived. He claimed under the settlement. After his wife died he had levied a fine, and applied to be admitted as a tenant of the court rolls, the land being copy-hold, and was admitted accordingly to hold the land in fee. But Lady Harwood was a minor when the settlement was executed, and hence it was invalid. He was entitled to possession during his life as tenant by the curtesy. Her heirs claimed the land. His heirs claimed it on the ground that her heirs were barred by the statute of limitations. The question was, whether his possession was adverse to her heirs, and upon its decision the case hinged. The court decided that the possession was *not* adverse. The parallelism of that case and this is obvious. Lord Harwood, in that case, held possession, claiming to hold in fee, though in law only entitled to hold for his life as tenant by the curtesy. In this case Mrs. Hannon held possession, claiming to hold in fee, though in law entitled to hold only for her life as

dowress.   See also *Nichols* v. *Reynolds*, 1 R. I. 39 (36 Am. Dec.
239); *Reesy* v. *Shomberger*, 2 Watts, 23 (26 Am. Dec. 94); *Jackson*
v. *Sharp*, 9 Johnson, 121 (6 Am. Dec. 267); *Arnold* v. *Stephens*,
24 Pick. 106 (35 Am. Dec. 305).

It is a settled principle that the possession of the tenant for
life, during the continuance of such life estate, will not bar the
remainderman, though the tenant for life may claim an estate
longer than for life, the possession of such life tenant and of
those claiming under him being not adversary to, but consistent
with and in support of the title of him in remainder.   See *Ball*
v. *Johnson*, 8 Gratt. 285 ; *Hope* v. *N. & W. R. R. Co.*, 79 Va. 283.
In the last-named case C., in 1851, conveyed to the company the
right of way through the land held by her as dower.   At her
death, Hope, the remainderman, brought his action for the land.
The defendant company pleaded the statute of limitations.   The
court held that the statute afforded no bar to the action.   It
seems equally well settled that where one enters into possession
under a lawful title to a particular estate in the premises, he is
presumed to continue to hold possession under that title until he
commits some notorious act of ouster or adverse possession, which
is *brought home* to the *knowledge* and *notice* of those entitled either
with or after him.   In *Caperton* v. *Gregory*, 11 Gratt. 505,
Thompson claimed the property under an alleged will, giving it
to him exclusively, and took possession of the whole of it, and
denied the title of the other coparceners, but they had full notice
thereof.   And so in *Layne* v. *Norris*, 16 Gratt. 243.

In Sedgwick and Waite on Trial of Land Titles, § 283, it is
said: "The adversary possession sets running a limitation, which
in the end may operate as a bar.   It does so only upon the
theory that the party disseized has slept upon his rights, and
by his silence and inaction has waived them.   The rule is just
if the ouster or adverse possession is brought home to the knowl-
edge of the owner, or is of such definite, hostile and public
character that such knowledge may be fairly presumed, that is
unjust and unreasonable if enforced without such limitation·

\*   \*   \*   The rule rests upon knowledge, acquiescence and *laches* on the part of the owner."

It is undeniable that in the case here there is not one of these essential elements. Here the next of blood kin of the intestate resided in different States distant from the city of Staunton, intestate's home, and were humble in condition, ignorant of the circumstances, and almost entirely illiterate, and have even been misled by false information. So far from being guilty of *laches* in asserting their rights, they were wholly unaware of the very existence of those rights. *Laches,* it has been held by this court, cannot be imputed to one who is ignorant of his rights.

And would it not be a strange and hard construction of the law to hold that one, who was in possession under a limited right, could be allowed to claim, *unknown* to the true owners, the entire estate, and then to defeat that claim upon the plea of having held the same under *such* adversary possession for the period which barred those true owners? That such a construction would be unjust, harsh and oppressive, is too obvious to need more than to state the proposition.

We confess that these views, which lead necessarily to a result opposite to that arrived at by the court below, have been reached only after a most careful and painstaking investigation, and, with reluctance, on account of prepossesions favorable to the claim of the devisees of Mrs. Hannon, induced by the peculiar circumstances of the case, she being the evident source of the purchasing power, it being through her that her husband acquired the means with which he made the purchase of the property in controversy. But the law, by virtue of her marriage with James Hannon, gave him those means, and he made the purchase in his own name, and took the title to himself, as he had the right to do ; and his widow acquired no more or further right than as his widow and dowager by her long and uninterrupted possession of the whole of the property whereof she was legally entitled to only a part. The law is so written, and it must prevail. For these reasons we are of opinion that .

the decree appealed from is erroneous and must be reversed with costs to the appellants. A decree will be entered here declaring the appellants to be the true heirs-at law of James Hannon, deceased, and capable of inheriting through him; that they are the legal owners of the property in question by inheritance from said Hannon, subject to the balance due thereon; and that the cause be remanded for further proceedings in accordance with the views herein expressed and the decree here entered.

DECREE REVERSED.