## WILBURN, APPELLANT, v. WAGNER ET AL., RESPONDENTS.

### (No. 4,283.)

(Submitted January 13, 1921. Decided March 29, 1921.)

[196 Pac. 978.]

*Specific Performance—Oral Contracts of Deceased Persons—Evidence—Insufficiency.*

Specific Performance—Oral Contracts—*Quantum* of Proof.

1. To warrant specific performance of a contract resting in parol it must be definite and certain in terms, free from all ambiguity, and so clearly proven as to satisfy the court that it constitutes the actual agreement between the parties, excluding mere hearsay or evidence of declarations to mere strangers to the transaction in chance conversations which the witness had no reason to recollect from interest in the subject matter and which may have been imperfectly heard or inaccurately remembered.

Same—Oral Contract of Deceased Person—Evidence—Insufficiency.

2. Evidence in an action for specific performance of an oral antenuptial agreement alleged to have been made some thirty-five years prior to trial between plaintiff's mother and testator, whereby the latter agreed to devise to plaintiff a child's part in his estate, reviewed, and *held* not of that clear and convincing character required to justify decree in her favor as against declarations contained in testator's last will and testament.

Same—Discretion.

3. Specific performance will be decreed only in the sound discretion of the trial court and not as a matter of course.

(MR. JUSTICE HOLLOWAY dissenting.)

*Appeals from District Court, Ravalli County; Asa L. Duncan, Judge.*

ACTION by Lucy Wilburn against John J. Wagner and others. Defendants had judgment. Plaintiff appeals from it and an order denying her a new trial. Affirmed.

Cause submitted on briefs of Counsel.

*Mr. H. H. Parsons,* for Appellant.

This court does not sit as a court of error to review; it tries the issues *de novo.* As Judge Lamm of Missouri so well said:

---

1. Certainty in contract requisite for its specific performance, see notes in 26 Am. Dec. 661; 140 Am. St. Rep. 58.

3. Authorities on the discretion of court to grant specific performance are collated in notes in 128 Am. St. Rep. 384; 140 Am. St. Rep. 57.

A case in equity on appeal is heard *de novo*, "barring a certain preference allowed by the upper to the lower court in weighing oral testimony and tagging it with a certain credit value." (*Troll* v. *Spencer*, 238 Mo. 81, Ann. Cas. 1913A, 276, 141 S. W. 855.) The special verdict of the jury was "advisory to the court which tried the case, and advisory to this court." (*Pealer* v. *Grays Harbor Boom Co.*, 54 Wash. 415, 103 Pac. 451.) This court will give that verdict the same weight that the trial court ought to have given it. The character of that weight is laid down in the case of *Peckham* v. *Van Bergen*, 8 N. D. 595, 80 N. W. 759.

In the discussion of the issues at bar we must understand clearly that most of the cases similar to plaintiff's are those wherein the deceased has contracted both to adopt the infant and to make it his heir. They are wholly distinct. The deceased may do both and then discriminate in the disposition of his property by will. He may be compelled to do either, without the other. The important thing to bear constantly in mind is this: A contract to adopt and to bequeath one his property are distinct and severable contracts. After death there can be no adoption; there can then be no specific performance; but this never interferes with a court compelling to specific performance of the agreement to bequeath a certain portion of the estate of deceased. (*Starnes* v. *Hatcher*, 121 Tenn. 330, 117 S. W. 219.) After death that is all the court can do.

Marriage as a consideration: A second matter to be kept constantly in view is the consideration passing to the deceased, Joseph Wagner, for his contract. In the first place, let it be remembered, that the question of consideration was wholly, solely and purely one to him—one on which his decision was final and conclusive. No other than he could determine what it meant to him and his life to have the child, Lucy Lamaster, enter his home, be under his dominion and bestow upon him her devotion and services. The child in "assuming a peculiar personal and domestic relation as a member of the family of the promisor, and in giving him the society and services in-

cident to such relation, and of a kind and character the value of which is not measurable in money," becomes a consideration to him the value of which he alone can tell. (*Robertson* v. *Corcoran*, 125 Minn. 118, 145 N. W. 812; *Burns* v. *Smith*, 21 Mont. 251, 69 Am. St. Rep. 653, 53 Pac. 742.) "The influences of a child of tender years in the home circle are too sacred and holy to be estimated in dollars and cents." (*Healey* v. *Simpson*, 113 Mo. 340, 20 S. W. 881.) Further, it may be said that marriage is not only a valuable consideration, but it is probably the most valuable consideration known to the law. (*Wrench* v. *Robertson* (Mo.), 175 S. W. 587; *Grantham* v. *Gossett*, 182 Mo. 651, 81 S. W. 895.)

The courts refuse to be overly nice or technical in the construction and enforcement of such contracts as these. (*Larsen* v. *Johnson*, 78 Wis. 300, 23 Am. St. Rep. 404, 47 N. W. 615.) "Rather than allow such a gross piece of dishonesty to go unredressed, the court would struggle with any amount of difficulties in order to perform the agreement." (*Wilson* v. *Furness Ry. Co.*, L. R. 9 Eq. Cas. 28; *Bennett* v. *Burkhalter*, 257 Ill. 572, 44 L. R. A. (n. s.) 734, 101 N. E. 189.)

Contract not *inter sesè:* Furthermore, there is a distinction, recognized in all courts, between an oral antenuptial contract, limited and confined solely to the parties making it, *inter sese*, and one where the rights of a third party—for instance, a two year old infant—are involved, and where the contract is not made for the benefit of the mother making it so much as it is for the infant in whose behalf and for whose benefit it is made. The distinction is both vital and far-reaching in its nature and scope.

Parallel cases are rare in equity practice, where agreements such as are alleged at bar are involved. However, the case of *Nowack* v. *Berger*, 133 Mo. 24, 54 Am. St. Rep. 663, 34 S. W. 489, is a case directly and absolutely in point. The contract alleged is almost identical with the one plaintiff alleges; the allegations and proof of performance on the part of the mother and child are identical; and the failure to provide by will at

death of the spouse no different. The same defenses were urged as here, and the same result and relief reached by the findings. The case was one of first impression in Missouri, the same as this is in Montana. The discussion of the principles involved is cogent and, as we think, unanswerable. (See, also, *Buck* v. *Meyer*, 195 Mo. App. 287, 190 S. W. 997; *Cathcart* v. *Myers*, 97 Kan. 727, 156 Pac. 751; *McCabe* v. *Healey*, 138 Cal. 81, 70 Pac. 1009; *Anderson* v. *Anderson*, 75 Kan. 117, 9 L. R. A. (n. s.) 229, 88 Pac. 746; *Baker* v. *Payne* (Mo. App.), 198 S. W. 74; *Best* v. *Grolapp*, 69 Neb. 811, 5 Ann. Cas. 491, 96 N. W. 641.)

We wish particularly to call attention to the case of *Kofka* v. *Rosicky*, 41 Neb. 328, 43 Am. St. Rep. 685, 25 L. R. A. 207, 59 N. W. 788. It would be difficult to find a more satisfactory case. (*Van Tine* v. *Van Tine* (N. J. Eq.), 1 L. R. A. 156, 15 Atl. 240; *Sharkey* v. *McDermott*, 91 Mo. 647, 4 S. W. 107.) In *Chehak* v. *Battles*, 133 Iowa, 107, 12 Ann. Cas. 140, 8 L. R. A. (n. s.) 1130, 110 N. W. 330, it is said: "Though a contract of adoption could not be sustained at common law, the courts of equity enforce such contracts, whether oral or in writing, with respect to property rights involved." (*Kramer* v. *Kramer*, 90 App. Div. 176, 86 N. Y. Supp. 129; *Wright* v. *Wright*, 99 Mich. 170, 23 L. R. A. 196, 58 N. W. 54; *Fuselier* v. *Masse*, 4 La. 424; 1 Cyc. 936, and cases cited in note.)

In *Daily* v. *Minnick*, 117 Iowa, 563, 60 L. R. A. 840, 91 N. W. 913, the supreme court held that even an oral promise to have the privilege only of naming a child was a valuable consideration for the promise to convey land, and that the bearing of the name by the child constituted payment and such performance as to take the case out of the statute of frauds, and that specific performance would be enforced. (*Blackwell* v. *Blackwell*, 196 Mass. 186, 12 Ann. Cas. 1070, 81 N. E. 910.)

If the mother, Lizzie Lamaster, and the child, Lucy, performed their part of the contract, that takes it out of the statute of frauds. (*Love* v. *Kirkbride Oil Co.*, 37 Okl. 804, 129

Pac. 858; *Johnson* v. *Cook*, 179 Mich. 117, 146 N. W. 343; *First Nat. Bank* v. *Cripple Creek State Bank,* 63 Colo. 37, 163 Pac. 1134; *Freitas* v. *Freitas,* 31 Cal. App. 16, 19, 159 Pac. 611, 619.) Through all of the cases cited herein, and in the text-books and authorities generally, there runs the doctrine that the statute of frauds cannot be used either as a weapon of offense or for the purpose of perpetrating or furthering a fraud. (*Teske* v. *Dittberner,* 70 Neb. 544, 113 Am. St. Rep. 802, 98 N. W. 57; *Ryan* v. *Dox,* 34 N. Y. 307, 90 Am. Dec. 696; *Wright* v. *Cline,* 172 Ky. 514, 189 S. W. 425; *Rogers* v. *Maloney,* 85 Or. 61, 165 Pac. 357; *Svenburg* v. *Fosseen,* 75 Minn. 350, 74 Am. St. Rep. 490, 43 L. R. A. 427, 78 N. W. 4; *Largey* v. *Leggat,* 30 Mont. 148, 75 Pac. 950.)

*Messrs. Wagner & Taylor,* for Respondents.

The case presented by the appellant was not of such character as would warrant specific performance. (*Wolfsen* v. *Smyer,* 178 Cal. 775, 175 Pac. 10.) The case of *Pantel* v. *Bower,* 104 Kan. 18, 178 Pac. 241, while not involving an antenuptial contract is fairly illustrative of the case at bar. (*Wright* v. *Raftree,* 181 Ill. 464, 54 N. E. 998, and the cases cited *infra.*)

The alleged contract, if made, is void under the statute of frauds. The alleged contract, being in parol, we contend is absolutely void, under the provisions of paragraphs 3 of section 5017, Revised Codes. A similar provision is found in many states in this Union, and likewise in the statute of frauds in England, and we contend that the decisions construing this provision are of binding force in this state. One of the best considered, and withal the most forceful, decisions we have been able to find upon the subject is that of *Hunt* v. *Hunt,* 171 N. Y. 396, 59 L. R. A. 306, 64 N. E. 159.

We have another statute of frauds similar to the one adverted by the court in the case last cited, which may be found in section 5091 of the Code; and, as intimated there, we likewise contend that decisions thereunder have no application

here. See in this connection, the case of *Adams* v. *Adams,* 17 Or. 247, 20 Pac. 633, and 21 Cyc. 1244. We think these authorities clearly establish the principle that this alleged contract was absolutely void from the beginning, and that the marriage of the parties did not take it out of the statute. Were the subsequent acts of the parties alleged in the complaint sufficient? In this connection, we call the court's attention to a Wisconsin case, found in 27 L. R. A. (n. s.) 1140 (*Rowell* v. *Barber,* 142 Wis. 304, 125 N. W. 937), holding that an oral antenuptial agreement which is made void by statute cannot be validated by an agreement embodying its terms executed after marriage. (See, also, *Ellis* v. *Carey,* 74 Wis. 176, 17 Am. St. Rep. 125, 4 L. R. A. 55, 42 N. W. 252; *Dicken* v. *McKinley,* 163 Ill. 318, 54 Am. St. Rep. 471, 45 N. E. 134.)

In *Henry* v. *Henry and Bennett,* 27 Ohio St. 121, plaintiff's wife agreed orally with him that if he would marry her she would convey to him a certain tract of land, provided he would enter upon and improve it and make a home for himself and his wife. The parties to this agreement were married, and the husband entered upon the land and made the improvements as agreed upon. Thereupon the wife executed a deed to the premises, in trust, to a third party, to be by the trustee conveyed to the husband. Under the Ohio statutes a *feme covert* could not convey without the signature of her husband. It was held that the original contract, being void under the statute of frauds, could not be validated by any act of the parties subsequent to marriage, short of complete and legal execution of the contract. The deed given in good faith by the wife being defective, for want of the husband's signature, was declared void. (See, also, *Ellis* v. *Carey, supra;* see, also, note to *Creel* v. *Codman,* 14 L. R. A. 863, and the well-considered case of *Pond* v. *Sheehan,* 132 Ill. 312, 23 N. E. 1018, decided by the Illinois supreme court and found in 8 L. R. A. 414.) The Indiana supreme court, in the case of *Austin* v. *Davis,* 128 Ind. 472, 25 Am. St. Rep. 456, 12 L. R. A.

120, 26 N. E. 890, held that a parol agreement to adopt a child as heir, and to leave her all of one's property at death, is within the statute of frauds, where the estate at death consists of property for the transfer of which a parol contract is not valid under the statute, and that performance upon the part of a girl of a parol contract, to live with a man and his wife during their lives, in consideration of their agreement to leave her all of the property, will not take the case out of the statute of frauds; and that one is not prevented from transferring his property by an agreement to leave all of his property at death to an adopted child, if the transfer is not made for the purpose of defrauding the latter. It will be observed that in the case at bar there is no allegation that deceased fraudulently executed the will indirectly involved herein so as to deprive plaintiff of any substantial right. (See, also, *McAnnulty* v. *McAnnulty,* 120 Ill. 26, 60 Am. Rep. 552, 11 N. E. 397; *Lloyd* v. *Fulton,* 91 U. S. 479, 23 L. Ed. 363 [see, also, Rose's U. S. Notes]; *Richardson* v. *Richardson,* 148 Ill. 563, 26 L. R. A. 305, 36 N. E. 608; *James* v. *Lane,* 103 Kan. 540, 175 Pac. 387; *Rowell* v. *Barber,* 142 Wis. 304, 27 L. R. A. (n. s.) 1140, 125 N. W. 937; *Hannon* v. *Hounihan,* 85 Va. 429, 12 S. E. 157; *Keady* v. *White,* 168 Ill. 76, 48 N. E. 314; *Swash* v. *Sharpstein,* 14 Wash. 426, 32 L. R. A. 796, 44 Pac. 862; and see note to *Baumann* v. *Kusian,* 44 L. R. A. (n. s.) 756 [164 Cal. 582, 129 Pac. 986].)

We contend that specific performance is not a proper remedy in the case at bar, notwithstanding what is said in the case of *Burns* v. *Smith,* 21 Mont. 251, 69 Am. St. Rep. 653, 53 Pac. 742, for the reason that the facts as alleged do not bring this case within the purview of that one. In that case we have presented a written contract for the adoption of a child, a contract entered into between the parties thereto for the express benefit of the child adopted; whilst here we have a contract where marriage is the consideration and the alleged adoption of the child an incident thereto.

MR. JUSTICE COOPER delivered the opinion of the court.

Lucy Wilburn brought this action in the district court of Ravalli county to enforce specific performance of an antenuptial oral agreement alleged to have been made between Joseph Wagner and her mother at a time the pleader was unable to fix.

The complaint alleges that Joseph Wagner expressly agreed, in consideration that plaintiff's mother would marry him and allow him to adopt the plaintiff as his own child and change her name from Lucy Lamaster to Lucy Wagner, and to have the care, custody, direction, companionship, love and devotion of the plaintiff until she should marry, he would, at his death, make her his heir and give and devise unto her a child's part and portion of his property and estate, the same as though she was his own bodily heir. The answer admits the marriage but denies that the agreement was ever made, and avers that, if it ever was made, it is invalid and unenforceable under the statute of frauds as embodied in section 5017 of the Revised Codes. The case was tried in the court below with the aid of a jury, their answer to special interrogatories submitted to them being that the testator, Joseph Wagner, prior to his marriage with the plaintiff's mother, made the contract sued on. The plaintiff moved the court to adopt the findings of the jury and to adjudge the plaintiff entitled to an undivided one-third of the estate. The court, instead, made findings of fact and conclusions of law of its own, to the effect that Joseph Wagner and the mother of the plaintiff did not, before their marriage nor at any other time, make or enter into an oral, or any other, contract whereby the plaintiff was to be, or ever was adopted as, the heir of the deceased, or that he ever agreed that he would devise or bequeath to her a child's part of his estate at the time of his death, but did, by will, bequeath the plaintiff the sum of $500, and rendered a judgment dismissing the action and denied a motion for a new trial. The plaintiff appeals from the judgment and order.

The evidence upon the trial discloses that in 1881 or 1882, at the time of the marriage, Joseph Wagner, with his brother Isador, and another brother, Sebastian, who had a wife and six or seven children, were living on a farm about a mile and a half from the town of Florence, in Ravalli county, and were working it as copartners. Shortly before the marriage Joseph had initiated a pre-emption claim adjoining the farm, a patent to which was later issued to him. After the marriage, he, together with his wife and her two year old daughter, the plaintiff, moved upon the land and continued to farm it until his death in the month of May, 1915, where the two children, the issue of the marriage, were born. For a period of two months prior to the marriage the plaintiff's mother worked for the Wagners assisting in the housework, and did not leave the place until she left with Joseph at 4 o'clock on the morning of the wedding to go to the Poole home, to ask their consent to the marriage. Their intention was to return to the Wagner place for the ceremony, but upon demand of the Poole family, the wedding occurred there instead. Until the other two children, John and Florence Wagner, were born, Lucy was the only child in the Joseph Wagner household. With them she continued to live, attended school and assisted about the house and the farm as a maturing young woman would ordinarily do. She did not learn that Joseph Wagner was not her natural father until she was twelve years of age; yet she continued to live at home as before. At the age of eighteen she was married and continued to live at home with her husband, Ed. Wilburn, for a period of about two years, her husband meanwhile working for wages for Joseph Wagner until they left to make their home in Hamilton, Ravalli county. In February, 1899, a month after the death of her mother, at the request of her half-sister Florence, both she and her husband returned to the home of Joseph Wagner, lived there, and in conjunction with Joseph Wagner, Jr., rented and worked the ranch. Whether the agreement declared upon was ever made must be determined by the circumstances as they existed at the

time, rather than by subsequent developments. Upon what basis, then, did Lizzie Lamaster agree to marry Joseph Wagner?

Frank See, the only witness present when the contract is alleged to have been made, testified on direct examination as follows: "Q. Did Lucy's mother say she would not marry him unless he made Lucy his heir? A. Yes. Q. That was before the marriage? A. Yes. Q. How long before the marriage? A. Quite a long time. Q. A few hours? A. Yes, two or three days, a week or two. Q. He was up there then some time before they were married? A. Yes. Q. After they were married, did Joe Wagner ever say anything to you as to this agreement he had with his wife about making Lucy his heir? A. I do not know as he said anything to me personally; I heard him say it. Q. What did he say? Did you hear him say it in your absence? A. Yes. It was talk with the folks, what he agreed to do, he said he would do it. Q. Tell what the conversation was,—what did he say about it after the marriage was over? A. He said he would do as he agreed to, he would make her his heir the same as his own, if he ever had any. Q. Was anything said about what share he was to give the plaintiff in this case as an heir? A. Well, no, no. Q. Did he say anything with reference to her having a child's part or what did he say, if anything? A. She was to share equal. Q. Equal with whom? A. With his heirs. Q. Was that talked over several times during the period that you and he were there? A. Yes. Q. And in the presence of the Poole family, you say? A. Yes. Q. Of whom did the Poole family consist? A. John Poole and his wife and Lucy's mother, Miss Lamaster it was then. Q. Those people are all dead now except Lucy? A. Yes." On cross-examination he testified: "Q. How long had you been living in the vicinity before the marriage took place? A. Ever since '68. Q. And how old were you? A. At the time this marriage took place I must have been fifteen or sixteen years old. Q. And from that time up until the time of Joe Wagner's death did you ever

discuss with anybody what occurred there at the marriage? A. No. Q. And yet, after the lapse of thirty-six years, you are in a position to state the language of the parties at this marriage with reference to this child? A. I did. Q. You have got a pretty good memory then, haven't you, Frank? A. Nothing extra; no. Q. What was the occasion of your being there at the Poole house on that day? Were you invited to the wedding? A. Yes. Q. How long before the wedding took place was it that you were invited to attend it? A. I don't know how long it was; I don't remember about that. Q. Who invited you to the wedding? A. Mr. Wagner's wife, Miss Lamaster. Q. How did she invite you,—write you a letter or just ask you? A. No, just ask me. Q. Did she come to your house to ask you, or where was it? A. If you want to know, I was about two-thirds of my time part of the Poole family; I was there when I was a kid. Q. Up to the time of the marriage? A. Yes. Q. How far did you live from them? A. Our farms joined but our houses were about a mile and a half apart. Q. You spent most of your time at the Pooles? A. A good deal of it. Q. Were you employed at the Poole's? A. No. Q. What was your occupation in those days? A. It was not much of anything; like a whole lot of other kids I loafed around a good deal. Q. What did the Poole family consist of? A. There was John Poole and his wife and this Miss Lamaster and her brother, and he had some children of his own, small children. Q. Her brother had some small children? A. No, her stepfather. Q. Lucy, the plaintiff in this case, was the daughter of the mother by a former marriage, was she, Mr. Poole was not Lizzie's father? A. No. Q. Was she a step-child of the Pooles? A. Yes. Q. That is, she was Mrs. Poole's daughter? A. Yes; John Poole married a widow with two children when he married her. Q. And Mrs. Wagner was one of those children? A. Yes. Q. You say Mrs. Wagner had a brother living there too? A. Yes. Q. Was he at the marriage? A. No, sir, he was not. Q. Where was he? A. He was over in Idaho at that time; he was over there something

like a year. Q. You say three or four days before the marriage Joe was up there? A. Yes, something like that. Q. And how long did he stay there at that time,—of course he stayed there until the marriage,—but how long after the marriage? A. He was there two or three, three or four days, I think, after they were married. Q. A couple of days? A. Yes, longer than that. Q. He was there three or four days before the marriage? A. No, I didn't say three or four days before the marriage. Q. Yes, you answered Mr. Parsons and also myself that he was there three or four days before the marriage and the conversation took place that long before? A. Maybe it was. Q. As I understand you, Joe was there three or four days before the marriage and stayed there a couple of days after the marriage? A. Yes, I guess so. Q. So he must have been there a week altogether? A. No, he was not there a week altogether. Q. Well, how long was he there altogether? A. He came up the day before he was married. Q. And when did he leave? A. A couple of days after the wedding. Q. How long was he there altogether? A. About three days, I guess. Q. You were there during all of that time? A. Well, yes, most of it.'' Concerning Lizzie Lamaster's property, he testified: ''Q. You say Lizzie had some property? A. Yes. Q. Of what did that property consist? A. Some horses, cayuses them was, and a few head of cows. Q. How many head of cows A. A few head; eight or ten. altogether. Q. How many horses? A. I do not know; there were about eight or ten head altogether. Q. Cattle and horses together? A. Yes. Q. And that was Lizzie's property? A. Yes. Q. Where did she get it A. Some of it was give to her. Q. How is that? A. I do not know where she got all of it; some of it was give to her. Q. The Pooles did not give it to her, her stepfather didn't give it to her? A. She had them; it was hers. Q. And she was only sixteen or seventeen years old A. Yes. Q. And how much stock did the Pooles have? A. I could not say; they had quite a bunch of stock; stock was not worth very much then; everybody had lots of stock; the

Pooles had quite a bunch of cattle and horses. Q. You were pretty intimate with Lizzie then; you must know where she got this property? A. I do not know; I know she had it. Q. And you never asked her where she got it? A. I know where she got some of it, of course I do; it was give to her. Q. Who gave it to her? A. She raised some of it, of course. Q. Who gave her the stock? A. I know Wade Blodgett gave her a cow that was down and gave it to her if she could raise it, and she raised it, I know. Q. Do you know where she got the rest of it? A. Some of the horses,—I know Fred Held gave her some of the horses. Q. How many? A. I do not know. I remember of him giving her a saddle-horse. Q. And who else gave her any of the property? A. I do not know who gave it to her. Q. What became of this property after the marriage? A. They took it to Wagner's. Q. How long after the marriage? A. I could not say how long; quite a while; I know she took some of the milch cows off the ranch and took them right with her. Q. Right with her? A. Not right with her, but they were taken to the Wagners."

The testimony of the witness Robert King, a neighbor, was that he had known Joseph Wagner and Lizzie Lamaster since 1887, had worked for them at different times, and had opportunities to observe the attitude of Joseph Wagner to Lucy, and of all the members of the family toward each other, and that, so far as he could see, they were not different from the ordinary family relations; that one afternoon in the year 1892 he stopped at their place; that Lucy and her mother were about to leave on account of some difficulty; that Joe Wagner talked over the "fuss" with him a little bit, and told him it grew out of the fact that Lizzie, his wife, had accused him of being mean to Lucy, putting more on to her, as he termed it, and favored the other two children, "something like that." "He told me he had tried to treat Lucy as good as the other children and he had promised to do that when he had taken her as a baby, and he asked me if I had noticed any difference during the time I had been around there, and I told him no."

Other witnesses testified to similar statements made to them, or in their presence by Joseph Wagner, on occasions between the marriage and the time the plaintiff and her husband left the home of the Wagners to live elsewhere, the sum of which was that he had as much affection for the plaintiff as he had for his own children and that he intended to give her a child's part of his property.

If the theory of the plaintiff is to be accepted, the thing that finally induced Lizzie Lamaster to yield to the importunities of Joseph Wagner was not so much the advantage of having her child constantly within her keeping, as it was her desire to secure to Lucy the right to inherit a child's portion of Joseph's property, at his death. The property Joseph then owned consisted of a cow, a team of horses and a claim upon the public domain—then considered hardly worth the trouble and expense of proving up. Is it possible that considerations of that character could find a place in the mind of a girl so young? And if so, did she place them above the nearer consideration of a permanent home for herself and child? Did she anticipate what would be left to satisfy the contract, and how many there would be to share it? Finally, could a young man, as youthful as See then was, accurately recollect and repeat details of the conversation making up the true point of the agreement the parties intended, so many years after? These were all dependent and interwoven elements for consideration in weighing the proof and settling the issues.

It is in evidence that Lizzie Lamaster and Joseph Wagner left the Wagner place on the morning of the wedding for the purpose of obtaining the consent of Mr. and Mrs. Poole to their marriage, and that their approval was withheld until Joseph and Lizzie had agreed to be married at the Poole place on that day; that the neighbors went to the Wagner home in response to invitations to be present at the wedding and participate in the celebration, but that they did not return until the evening after. If Isador Wagner's statement that Lizzie was not absent from the Wagner place from the time she came

there until they left that morning for the Poole place is true, it cannot be, as See states, that the terms of the antenuptial contract were agreed upon in his presence at the Poole place the day before the wedding. He also testified that when they returned home after the wedding, Joseph and Lizzie had with them only one saddle-horse, the saddle being carried in the bed of the wagon, to which the horse was tied.

Mrs. Buckhouse, a neighbor of the Wagners, and other witnesses testified that they went to the Wagner home to be present at the wedding, but on arriving found that the couple had left for the Poole place; that they waited there until the couple returned on the following day and participated in the celebration of the wedding feast.

It was within the province of the district court to believe the testimony of Isador Wagner in preference to the dubitable account See essayed to give of the occurrences at the time the contract was made. In view of the lapse of time, the youth of See, the discrepancies in his testimony and his faulty narrative of the facts attending the transaction upon which the action is based, and from the evidence as a whole, the court was justified in holding that the case was founded more on imagination and hearsay than upon the impressions actually received by the witnesses from the happenings themselves. Having concluded that the plaintiff had failed to establish her case, its judgment must be accorded the presumption attending the conclusion of every court of first impression. In all cases of this nature, courts must jealously uphold the quantum of proof; for if the standard is to be lowered or weakened, there is grave danger that unfounded claims may be fastened upon estates of persons after their decease, solely because of the absence of countervailing evidence. Unless we do find ourselves able to say that the weight of the evidence is decidedly against the finding of the court below, we are not free to interfere with its final judgment. (*Wright* v. *Brooks,* 47 Mont. 99, 130 Pac. 968.)

Contracts resting in parol must be definite and certain in
[1]  terms, and free from all ambiguity, if specific perform-
ance is to be decreed. A contract of the nature now sought
to be enforced must be clearly proven so as to satisfy the court
that it constitutes the actual agreement between the parties.
If this were not the rule, courts might "enforce precisely what
the parties never intend or contemplate." (*Waters* v. *How-
ard,* 8 Gill (Md.), 277.) Mr. Justice Grier, speaking for the
supreme court of the United States upon the certainty of the
proof necessary in actions for the specific performance of parol
contracts, uses this apt language: "It cannot be made out by
mere hearsay, or evidence of the declarations of a party to
mere strangers to the transactions, in chance conversations,
which the witness had no reason to recollect from interest in
the subject matter, which may have been imperfectly heard or
inaccurately remembered, perverted or altogether fabricated;
testimony, therefore, impossible to be contradicted." (*Purcell*
v. *Miner,* 4 Wall. 518, 18 L. Ed. 435 [see, also, Rose's U. S.
Notes].)

Conceding, for the purpose of argument, that there was a
[2]  contract of some sort, the testimony as to its exact nature
is not of that clear, convincing kind that leaves the mind so
free of doubt that countenance ought to be given to a claim
against a dead man at variance with the last recorded ex-
pression of his will. (See the cases of *Grantham* v. *Gossett,*
182 Mo. 651, 81 S. W. 895; *Wales* v. *Holden,* 209 Mo. 552,
108 S. W. 89; *Monsen* v. *Monsen,* 174 Cal. 97, 162 Pac. 90;
2 Story's Eq. Jur., 14th ed., sec. 1016a; Pomeroy's Eq. Jur.,
sec. 2252; *Pemberton* v. *Perrin,* 94 Neb. 718, Ann. Cas. 1915B,
68, 144 N. W. 164; *Davis* v. *Hendricks,* 99 Mo. 478, 12 S. W.
887; *Bauman* v. *Kusian,* 164 Cal. 582, 44 L. R. A. (n. s.) 756,
129 Pac. 986; *Hannon* v. *Hounihan,* 85 Va. 429, 12 S. E. 157;
*Winke* v. *Olson,* 164 Wis. 427, 160 N. W. 167.)

Specific performance will be decreed only in the sound dis-
[3]  cretion of the court—never as a matter of course; and
even then it is granted or withheld according to the circum-

stances of the particular case. (2 Story's Eq. Jur., 14th ed., sec. 1026; 36 Cyc. 548, "Discretion"; *Kraft* v. *Egan*, 78 Md. 36, 26 Atl. 1082; *Semmes* v. *Worthington*, 38 Md. 298.)

Neither the integrity nor the good faith of any witness is intended to be impugned by anything we have said. Unfortunately for plaintiff, all the evidence offered to establish the contract purported to be nothing more than mere verbal declarations and statements of the deceased, the witnesses to them having no other means of identifying the expressions used than their power to recall details of conversations after the lapse of many years. What can better emphasize the wisdom of the statute of frauds than the example this very case affords? And what better reason can move a court of equity to require not only clear proof of the accuracy of oral statements, but proof that convinces the mind that the relief sought was just what the contracting parties intended?

After carefully reading all the evidence in the cold type to which we are confined, and patiently reviewing all the questions counsel suggest, we are not able to convince ourselves that the district court, in closer view of all the elements attending the subject matter of the inquiry and an opportunity to scan the faces of the witnesses and observe their demeanor under examination, has either misjudged the evidence or wrongfully refused the relief demanded.

The judgment and order are affirmed.

*'Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS and GALEN: We concur in the result reached by Mr. Justice Cooper but think he has extended his discussion beyond what the exigency of the case requires and that a part of it is not entirely pertinent to the question presented by the record, *viz.:* Does the evidence clearly preponderate against the finding of the district court? It is apparent that if the testimony of defendants' witnesses is to be accepted as true, that of the witnesses for plaintiff must be rejected entirely. A

brief reference to the salient features of the evidence would, in our opinion, have been sufficient to demonstrate that the result reached by the district court was fully justified by it and, hence, that the judgment must be affirmed.

MR. JUSTICE HOLLOWAY dissenting.